IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ROBINSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | |
| | : | No. 23-cv-3561 |
| EURO MOTORS d/b/a BMW OF MAIN LINE, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**MEMORANDUM**

**J. Younge**                                                        **October 3, 2024**

## I.      INTRODUCTION

Currently before this Court is Defendant's Motion for Summary Judgment (ECF No.

20.)[1]  The Court finds this Motion appropriate for resolution without oral argument.  Fed. R. Civ.

P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, said Motion is DENIED.

## II.     FACTUAL BACKGROUND

Plaintiff Michael Robinson filed this civil action against Defendant Euro Motors d/b/a

BMW of Main Line ("Defendant" or "BMWML") for alleged discrimination and harassment

based on race and disability. (Amended Complaint (hereinafter "Am. Compl."), ECF No. 8).

Plaintiff is a Black man that has been diagnosed with diabetes. (Am. Compl. ¶ 12).

On August 11, 2018, Plaintiff began working for BMWML, a car dealership, as a Client

Advisor. (Am. Compl. ¶ 10). In this position, Plaintiff's role was to sell vehicles at the

dealership. (Am. Compl. ¶ 11). Plaintiff reported to Nick DeFelice, Defendant's New Car Sales

Manager. (Defendant's Statement of Undisputed Material Facts (hereinafter "DSUMF"), ECF

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system,
which does not always match the document's internal pagination.

No. 20-2 ¶ 3). BMWML's management also included Afroze Khan, Defendant's General Sales Manager, and Joe Serock, the General Manager of Defendant as of 2022. (DSUMF ¶¶ 4-5).

During his employment with BMWML, Plaintiff applied for a leave of absence once a year under the Family and Medical Leave Act ("FMLA") between 2020 and 2022. (DSUMF ¶ 16). Defendant approved each of these requests, which were all related to Plaintiff's diabetes condition. (DSUMF ¶¶ 17-18). At the end of each of his FMLA leaves, Plaintiff regularly returned to BMWML to his same position.  (DSUMF ¶ 20).

However, after Plaintiff returned from his 2022 FMLA leave in August of that year, he noticed that BMWML emptied his book of business and distributed it to other employees. (Plaintiff's Counterstatement of Material Facts (hereinafter "PCMF", ECF No. 21 ¶ 7). BMWML has a system called InfoBahn that includes a portfolio of all the customers each Client Advisor leased or sold vehicles to or contacted (Plaintiff's book of business hereinafter referred to as "InfoBahn"). (PCMF ¶ 8). Prior to going out on leave in 2022, Plaintiff's InfoBahn contained a couple of hundred names of Plaintiff's clients, but when he returned, his InfoBahn was empty. (PCMF ¶¶ 9-11). Thereafter, Plaintiff complained to Mr. DeFelice and Mr. Kahn about his InfoBahn, but according to Plaintiff, "nothing happened" from said conversation. (PCMF ¶ 13).

Around the same time, in October of 2022, Plaintiff started wearing special shoes because of his medical condition. (PCMF ¶ 14). Soon after, Mr. Serock told Plaintiff that he wanted an email directly from Plaintiff's doctor stating that he had to wear special shoes as part of the job. (PCMF ¶ 15). Plaintiff provided Mr. Serock a doctor's note that stated that he needed an accommodation. (PCMF ¶ 16; DSUMF ¶ 28). Meanwhile, Mr. DeFelice and Mr. Khan were making comments about Plaintiff's shoes, which Plaintiff describes as pointing, laughing, and

snickering. (DSUMF ¶ 24). When Plaintiff told Mr. DeFelice and Mr. Khan that he had to wear the shoes because of his medical condition, he testified that they continued to make fun of his footwear. (PCMF ¶¶ 20-22).

Plaintiff complained to Mr. Serock on several occasions about the comments made by Mr. DeFelice and Mr. Khan. (Defendant's Exhibit A, Plaintiff's Deposition (hereinafter "Def. Ex. A") 46:8 – 47:4). Despite these complaints, and Plaintiff's decision to change the color of his shoes from white to black, Mr. DeFelice and Mr. Khan continued to make mocking remarks. (PCMF ¶ 24). For example, Plaintiff testified that they would point down at his shoes, snicker, and say "you're sick." (PCMF ¶ 26). And on another occasion, during a staff meeting, Mr. Khan said "I guess Robinson's sick 'cause of his shoes, huh.'" (DSUMF ¶¶ 31-33).[2] Plaintiff noticed that after he complained to Mr. Serock, Mr. DeFelice's "disposition toward [him] changed." (PCMF ¶ 26).

Shortly after Plaintiff made his accommodation request, Mr. Khan told Andrenna Reed, a BMWML employee who was responsible for providing leads to the Client Advisors, not to give Plaintiff any more sales leads. (PCMF ¶¶ 37-38). Contrary to Ms. Reed's testimony that she had no knowledge as to why Mr. Khan gave her that instruction, (DSUMF ¶ 37), Plaintiff testified that when he asked Ms. Reed about his decreased leads, Ms. Reed told him that management told her to give certain leads to "white guys." (DSUMF ¶ 36). Relatedly, Ms. Reed testified that there "always was a discrepancy every time [she] gave leads to [B]lack individuals, so [she] just

---

[2] In reference to treatment about attire, Plaintiff testified that a White salesperson wore pajamas and slippers to work, but did not face similar backlash because he "was allowed to do that." (Def.'s Ex. A, 95:8-97:8). Further, another BMWML employee, Andrenna Reed, testified that Plaintiff was told he could not have his "shoes off at [his] desk" after he had them off because his feet were in pain. (Def.'s Ex. D, 82:15-84:4). Then, after he was told this, she saw a White salesperson walking around with no shoes in the office. (Def.'s Ex. D, 83:19-84:4). In response to the White employee not having their shoes on, she explained that management was "laughing" and "thought it was hilarious," as if they were "okay with that." (Def.'s Ex. D, 82:19-83:14).

stopped." (Defendant's Exhibit D, Andrenna Reed Deposition (hereinafter "Def. Ex. D") 46:8-9). Further, she admitted that she disproportionately sent leads to White Client Advisors "because that was the only way [she] was able to keep [her] job." (Def. Ex. D, 43:19-44:12).[3]

Plaintiff testified that he had several conversations with Mr. Serock where he told him that he believed that his not receiving leads was related to his medical condition. (PCMF ¶ 45). In November and December of 2022, Plaintiff continued to receive few, if any, leads. [4] (PCMF ¶ 47).  As a result, on January 6, 2023, Plaintiff sent a resignation letter to Mr. Serock stating that he was quitting due to Defendant taking away his leads. (PCMF ¶ 47; Defendant's Exhibit E, Resignation Letter (hereinafter "Def. Ex. E")). Mr. Serock testified that Plaintiff's resignation letter was the only time Plaintiff complained to him about a correlation between his medical leave and his leads. (DSUMF ¶ 50).

On May, 19, 2023, Plaintiff filed a complaint with the Equal Employment Opportunity Commission, which issued a Right to Sue letter on July 3, 2023. (Am. Compl. ¶¶ 7, 9). Thereafter, Plaintiff filed a Complaint in federal court on September 14, 2023, alleging discrimination and harassment in violation of the Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 1981 ("§ 1981") and the Americans with Disabilities Act ("ADA").[5] (ECF No. 1).

---

[3] Plaintiff testified that BMWML has a "culture" of racism. (Def. Ex. A, 141:4-22). Plaintiff noted that the BMWML's Detail Department treated him differently because of his race. (Def. Ex. A, 81:14-82:1). In his experience with the Detail Department, he found that he would get charged for damages to a vehicle, while White employees who went to the Detail Department would not get charged. (Def. Ex. A, 80:7-82:1).

[4] Plaintiff asserts that based on his W-2s from BMWML, he earned $98,892.88 in 2021, but only $82,177.68 in 2022. (PCMF ¶ 110). In his briefing, Plaintiff argues that this difference is representative of over $17,000 in loses over the three months that management began removing his leads. (ECF No. 21-1, p. 6). Further, he asserts that if these losses were projected out to a year, he would earn less than one-third of what he typically earned in a year. (ECF No. 21-1, p. 6).

[5] The original Complaint included state law claims of discrimination and harassment under the Pennsylvania Human Relations Act, (ECF No. 1), but Plaintiff voluntarily withdrew them in the

Plaintiff subsequently filed an Amended Complaint on November 15, 2023. (Am. Compl.).

Defendant filed the present Motion for Summary Judgment on August 12, 2024. (ECF No. 20).

### III.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013).  If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

Amended Complaint because the administrative procedures for said claims had not yet been exhausted. (Am. Compl., Counts II-IV).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).   In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Retaliation and Disparate Treatment Claims

Plaintiff's retaliation and disparate treatment claims under the ADA, § 1981, and Title VII (Am. Compl., Counts I, V, VII, and IX) are all analyzed through the *McDonnell Douglas* burden-shifting framework. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (applying the *McDonnel Douglas* framework for Title VII claims); *Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 89 (3d Cir. 2015) (applying the *McDonnell Douglas* framework to a § 1981 claim); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) ("We have indicated that the burden-shifting framework of *McDonnell Douglas*… applies to ADA disparate treatment and retaliation claims."). As such, this Court will apply the following framework, as described by the Third Circuit, to said claims:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff
>
> succeeds in establishing a prima facie case, the burden shifts to the defendant "to
>
> articulate some legitimate, nondiscriminatory reason for the employee's rejection."

Finally, should the defendant carry this burden, the plaintiff then must have an

opportunity to prove by a preponderance of the evidence that the legitimate reasons

offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (citations omitted) (quoting

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252–53 (1981)). The Third Circuit

notes that most cases turn on the third step of this framework. *Id.*

Defendant asserts that Plaintiff is unable to establish a prima facie case for Counts I, V,

VII, and IX. (ECF No. 20-2, p. 6). To establish a prima facie case of retaliation under the ADA,

Plaintiff must show that (1) he engaged in protected activity; (2) the employer took an adverse

action after or contemporaneous with Plaintiff's protected activity; and (3) there is a causal

connection between the protected activity and the adverse action. *See Krouse v. Am. Sterilizer*

*Co.*, 126 F.3d 494, 500 (3d Cir. 1997). And to establish a prima facie case of disparate treatment

under the ADA, § 1981, and Title VII, Plaintiff must show that (1) he is a member of a protected

class; (2) he is qualified for the position he held or sought; (3) he suffered an adverse

employment action; and (4) the circumstances of his termination gave rise to an inference of

discrimination. *See Taylor v. Brandywine Sch. Dist.*, 202 F. App'x 570, 575 (3d Cir. 2006)

(applying to Title VII claim); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (applying  a

similar standard to ADA claim); *Jarmon v. Trader Joe's Co.*, 660 F. Supp. 3d 357, 363 (E.D. Pa.

2023) (applying to a § 1981 claim).

In their Motion, Defendant argues that Plaintiff has not sufficiently demonstrated that

there was an adverse employment action, and even if there was such an action, there is no

evidence that it occurred because of race or disability status. (ECF No. 20-2, p. 6). Because

Defendant has not contested the other factors of the prima facie case, this Court will not address

them at this time. In this Court's assessment, Plaintiff sufficiently supported the contested

prongs, such that a reasonable jury could find Counts I, V, VII, and IX in Plaintiff's favor.

### 1.    Adverse Employment Action

The Supreme Court has recently articulated that an adverse employment action need not

be "significant… or serious, or substantial, or any similar adjective suggesting that the

disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis,*

*Missouri*, 601 U.S. 346, 355 (2024) (internal quotations omitted). Instead, it suffices for a

Plaintiff to show that there was "some injury respecting [Plaintiff's] employment term or

conditions… [that] left [Plaintiff] worse off." *Id.* at 359. Therefore, for a disparate treatment

claim, Plaintiff does not have to "establish an elevated threshold of harm." *Id.* at 355. However,

with respect to retaliation claims, the Court clarified that the "materially adverse" standard

articulated in *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) still

applies for such claims. *Id.* at 357. Retaliation claims, according to the Court, are "meant to

capture those employer actions serious enough to 'dissuade a reasonable worker from making or

supporting a charge of discrimination.'" *Id.* (cleaned up).

Plaintiff has sufficiently demonstrated that he suffered an adverse employment action by

Defendant under the disparate treatment and retaliation standards. He has alleged, among other

things, that after he returned from his FMLA leave in 2022, Defendant removed his book of

business containing hundreds of contacts and stopped giving him new sales leads. In support of

his claim, Ms. Reed, who distributes sale leads, testified that she was told by BMWML

management to stop giving sales leads to Plaintiff. Thereafter, according to her testimony, she

did not give Plaintiff any more sales leads. As a car salesman who is paid through commission,

having sale leads to generate business is undoubtedly crucial to succeeding financially in the

role. Removing the potential to create this business, which Plaintiff asserts actually did cause him financial harm, is an adverse employment action. *See Smith v. Presidio Networked Sols., Inc.*, No. 22-736, 2024 WL 3203314, at *14 (E.D. Pa. June 26, 2024) (finding that taking "key accounts away from" a plaintiff who earns commissions is "sufficient to show adverse employment action."); *Dawson v. Philadelphia Media Holdings, LLC*, No. 06-3604, 2008 WL 2795832, at *16 (E.D. Pa. July 18, 2008) (finding that "for purposes of summary judgment," the defendant's "alleged failure to assign [the plaintiff] a fair share of sale leads" constituted an adverse employment action.).

### i.  *Constructive Discharge*

Plaintiff further asserts that the "working conditions were such that no reasonable person could have been expected to endure them," and as a result, he was "constructively discharged." (Am. Compl. ¶ 50). Defendant disagrees, arguing that Plaintiff fails to satisfy the factors that courts have considered to establish constructive discharge.

As noted by Defendant, constructive discharge is not an independent cause of action, but rather an adverse employment action. *See Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp. 3d 546, 556 (E.D. Pa. 2017). The Third Circuit has explained that claims of constructive discharge are evaluated under an "objective standard." *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (citation omitted). Under this standard, the court must evaluate "whether a reasonable person under the circumstances would have felt compelled to resign." *Id.* (internal quotations omitted). Courts have considered "factors such as whether the employee was threatened with discharge, encouraged to resign, demoted, subjected to reduced pay, benefits or responsibilities, transferred to a less desirable position, or given unsatisfactory job evaluations." *Russo v. Bryn Mawr Tr. Co.*, No. 22-3235, 2024 WL 3738643, at *4 (3d Cir. Aug. 9, 2024).

However, "the absence of the[se] factors ... is not necessarily dispositive[.]" *Id.* (citing *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168–69 (3d Cir. 2001).)

Viewing all genuinely disputed material facts in the light most favorable to the non-moving party, this Court finds that a reasonable jury could find that Plaintiff was constructively discharged. As discussed in detail above, Defendant's removal of Plaintiff's contacts and refusal to provide new leads had significant potential to affect Plaintiff's ability to do his job and earn an income. And in fact, Plaintiff contends that these actions did cause him to make less money during that period when compared to the previous year. These actions meet the standard for constructive discharge because no reasonable person would continue to work under conditions where their earning potential has been reduced. *See, e.g., Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 888–89 (3d Cir. 1984) (finding constructive discharge where a "plaintiff's compensation was based mostly on commissions," and her transfer led to a "substantial cut in pay."). Further, and contrary to Defendant's assertion, Plaintiff contests that he had had several conversations with management where he complained that his not getting sale leads was related to his medical conditions. Because Plaintiff argues that he continued to not receive leads after said conversations, a reasonable jury could see that Plaintiff "sufficiently explore[d] alternative solutions" and "demonstrate[d] that [he] had no option left but to resign." *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 79 (3d Cir. 2018).

## 2.    Causal Connection Between Protected Activity and Adverse Action

For a retaliation claim, "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007). If "the temporal proximity between the protected activity and the adverse action is 'unusually

10

suggestive,'" a court can find this "sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001)). However, "[w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee[.]" *Marra,* 497 F.3d at 302.

Here, Plaintiff sufficiently identifies a causal connection. In October of 2022, after Plaintiff returns from FMLA leave, Plaintiff requests an accommodation to wear shoes for his disability. Shortly after this request, in that same month, Mr. Khan ordered Ms. Reed to stop giving Plaintiff sale leads. Because "[t]his timing is well within the three-month range to be unusually suggestive of retaliatory motive… [a] jury could find that the proximity… is enough to infer causation." *Qin v. Vertex, Inc.,* 100 F.4th 458, 477 (3d Cir. 2024). Even if this Court was not convinced by the temporal proximity, this evidence, in conjunction with additional evidence of animus toward Plaintiff, does demonstrate a causal link. During the period between requesting the accommodation and Mr. Khan's order to Ms. Reed, Mr. Khan repeatedly made taunting comments about Plaintiff's shoes, which referenced that Plaintiff was "sick." From this, a trier-of-fact could infer that Defendant's adverse action was triggered by Plaintiff's request.

### 3.   Inference of Discriminatory Intent

Finally, with respect to the disparate treatment claims, Defendant argues that Plaintiff has not provided "evidence in the record to support that Plaintiff's race or disability played a part in the [adverse action]." This Court disagrees.

Plaintiffs "may survive summary judgment by pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Jones*, 198 F.3d at 413. In order "[t]o determine whether discriminatory circumstances are present, [the Third Circuit has] looked for comparisons to similarly-situated employees." *Evans v. Sch. Dist. of Philadelphia*, No. 23-1086, 2024 WL 4199010, at *2 (3d Cir. Sept. 16, 2024) (internal quotations omitted). In cases where "similarly-situated comparisons are not present, the [plaintiff] must establish some causal nexus between the plaintiff's membership in a protected class and the adverse employment action." *Id.* (internal quotations omitted).

Plaintiff has identified evidence that raises an inference of racial discriminatory intent behind Defendant denying him new sales leads. First, Ms. Reed, who is responsible for distributing sale leads, testified that race played a significant role in how sale leads were distributed. She claimed that when she gave leads to White employees, "there were no complaints… and my work [was] phenomenal[,]" but when she gave leads to Black employees, there was a "discrepancy every time[.]" (Def. Ex. D, 44:8-12, 46:8-9). As a result of management's disapproval, Ms. Reed testified that she provided significantly more leads to White Client Advisors compared to Black Client Advisors because "that was the only way [she] was able to keep [her] job." (Def. Ex. D: 43:24-44:4). Further, Plaintiff and Ms. Reed testified about numerous occasions where Plaintiff was treated less favorably than White employees, including in circumstances that relate to Plaintiff's shoes. In what Plaintiff describes as a "culture" of racism, (Def. Ex. A, 141:4-22), and in the absence of a stated reason for ordering that Plaintiff not receive new leads, a reasonable jury could infer racial discrimination under Title VII and § 1981. Separately, this Court's discussion of causal connection for the retaliation

claim also supports that a reasonable jury could find an inference of discrimination for the disparate treatment claim under the ADA.

### B.      Hostile Work Environment Claims

Plaintiff's hostile work environment claims under the ADA, § 1981, and Title VII (Counts VI, VIII, and X) are all analyzed under identical frameworks. Plaintiff must establish the following: (1) the employee suffered intentional discrimination because of their race or disability status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondent superior liability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (applying these factors to a Title VII claim); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (applying these factors to a § 1981); *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999) (applying similar factors to the ADA).

Defendant seemingly argues that Plaintiff has failed to produce evidence to satisfy the "severe or pervasive" prong for Counts VI, VIII, and X. (ECF No. 20-2, p. 4). In this prong, "the difference between the [severe and pervasive] standards is meaningful… [as] the distinction means that severity and pervasiveness are alternative possibilities." *Castleberry*, 863 F.3d at 264 (internal quotations omitted). While "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* However, under both standards, "[f]or discrimination to constitute severe or pervasive behavior, it must alter the conditions of the victim's employment and create an abusive working environment." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (internal quotations omitted). Courts review the following factors in this analysis: "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry*, 863 F.3d at 264. In review of these factors, this Court finds that a reasonable jury could find that this prong is satisfied for Plaintiff's race and disability claims.

### 1.      Disability Under the ADA

Defendant asserts that Plaintiff has only provided evidence of one negative comment related to his disability. (ECF No. 20-2, p. 4). To the contrary, Plaintiff contests that after returning from his FMLA leave in 2022, over the span of a few months, he was subjected to nine acts of harassing conduct. These actions include numerous comments that made fun of Plaintiff's shoes as they relate to his disability, the removal of his sale contacts and refusal to provide new sale leads, and mistreatment of Plaintiff's use of his shoes when compared to White employees. As such, this is not a case of "offhand comments and isolated incidents [that would be considered] insufficient to sustain a hostile work environment claim." *Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019).

Such as in the case here, harassment is pervasive "when incidents of harassment occur either in concert or with regularity." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). Plaintiff can recount five snide and sarcastic comments from two supervisors, Mr. DeFelice and Mr. Khan, after he took an accommodation to wear special shoes to treat his disability. The comments made fun of his accommodation and downplayed his disability by repeatedly joking that Plaintiff was "sick." Further, as Plaintiff endured these comments, one of his alleged harassers, Mr. Khan, told Ms. Reed, who distributes sale leads, to stop giving Plaintiff new leads. After Plaintiff's leads were disrupted, Plaintiff confronted Ms. Reed, who

told him that the order came from management. For months thereafter, Plaintiff worked with either no or few leads, which negatively affected his ability to earn commission. Based on these facts, with respect to the disability hostile work environment claim, a reasonable jury could find that defendant's concerted actions within this short span of time altered Plaintiff's employment and created an abusive working environment.

2.    **Race Under Title VII and § 1981**

Plaintiff has also presented sufficient evidence for a reasonable jury to find that the race-based harassment was severe or pervasive. Defendant points out that Plaintiff can only testify to a "culture" of racism, rather than specific "overtly racist" comments. (ECF No. 20-2, p. 4). Despite the absence of such evidence, "the advent of more sophisticated and subtle forms of discrimination requires that [this Court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 76 (3d Cir. 2003).

In this analysis, Ms. Reed's testimony is critical. She testifies that management would give her issues when she gave new leads to Black Client Advisors, but would be approving of her work when she gave leads to White Clients. As a result, she claimed that management's behavior led her to give substantially more leads to White Client Advisors than Black Client Advisors. In this context, Mr. Khan's subsequent order to stop giving Plaintiff leads, as similarly explained above, would lead "a reasonable fact-finder [to] find that… the facially neutral mistreatment of [Plaintiff by] members of the management team was related to race." *Sherrod*, 57 F. App'x at 76. These actions, which Plaintiff contests deprived him of new leads from

Defendant for months and negatively impacted his income, certainly "interfered with [Plaintiff's] work performance," such that a reasonable jury could find that the conduct was severe. *Id.* at 77.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**

16